PSI REPAIR SERVICES, INC.,
Plaintiff–Appellant,

v.

HONEYWELL, INC., Defendant–
Appellee.

No. 95–1351.

United States Court of Appeals,
Sixth Circuit.

Argued May 16, 1996.

Decided Jan. 13, 1997.

Rodger D. Young (argued and briefed), Anthony P. Cho (briefed), Young & Associates, Southfield, MI, for plaintiff–appellant.

Thomas W.B. Porter, Dykema & Gossett, Detroit, MI, Matthew L. Woods (briefed), Elliot S. Kaplan (argued), Robins, Kaplan, Miller & Ciresi, Minneapolis, MN, for defendant–appellee.

Before: BOGGS and MOORE, Circuit Judges; HILLMAN, District Judge.*

MOORE, Circuit Judge.

This case presents several issues involving §§ 1 and 2 of the Sherman Antitrust Act.[1]

---

* The Honorable Douglas Hillman, United States District Judge for the Western District of Michigan, sitting by designation.

1. Section 1 of the Sherman Act provides in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Section 2 provides: "Every person who shall monopolize, or attempt

Plaintiff PSI Repair Services, Inc. ("PSI") asserted an illegal tying claim under § 1 and a monopolization claim under § 2 against defendant Honeywell, Inc. ("Honeywell"). The district court granted summary judgment in favor of Honeywell on both counts. For the reasons that follow, we affirm, on different grounds, the judgment of the district court.

## I. BACKGROUND

Honeywell manufactures and sells industrial control equipment. This equipment controls the manufacturing processes at various refineries and factories. At issue in this case are three different types of control equipment: the TDC, or "Total Distributed Controller"; the PLC, or "Programmable Logic Controller"; and the UDC, or "Universal Digital Controller." The TDC, which ranges in price up to $800,000 per unit, automates and controls the manufacturing processes at industrial facilities, such as oil refineries, paper mills, and chemical processing plants. The PLC controls various robotic operations on automobile assembly lines. While less sophisticated than a TDC, the PLC and TDC share some common characteristics. The third controller at issue, the UDC, which ranges in price from $250 to in excess of $4,000, regulates temperature operations in various industrial settings. J.A. at 371.

Honeywell's industrial control equipment contains and depends heavily on printed circuit boards. These boards, which range in price from $200 to $5000, are comprised of a thin rectangle of fiberglass that is laminated with copper foil. Placed on this fiberglass are numerous components, such as computer chips, that communicate with each other via the copper foil on the board. These components periodically fail, which in turn often causes the circuit board and the industrial control equipment also to fail. J.A. at 38–39. When a circuit board fails, Honeywell will replace it with a new or refurbished board, charging its customer fifty percent of the list price, so long as the customer returns the defective board. J.A. at 306. Upon receipt of the defective board, Honeywell evaluates it to determine whether it is repairable. If it is, Honeywell will replace any defective component and then test the board before placing the board back into its inventory. Thus, the customer does not receive the same board that it returned. Honeywell does not distinguish between its new and refurbished boards within its parts inventory. J.A. at 295.

Roughly ninety-five percent of the components on the circuit boards, referred to as "generic components," can be purchased either from the component manufacturer or from a component distributor. The other five percent are designed specifically for Honeywell by third-party manufacturers, as Honeywell itself does not manufacture components. Honeywell has restrictive agreements with these manufacturers whereby the manufacturers agree not to sell these components to either Honeywell equipment owners or service organizations such as PSI. Honeywell also has a stated policy of not selling its components to anyone. J.A. at 295. When a circuit board fails, equipment owners cannot usually identify which component caused the failure. J.A. at 1059. Thus, as a result of Honeywell's restrictive policy, its equipment owners essentially must return to Honeywell to obtain an entire replacement board.

PSI offers circuit-board repair services to owners of industrial control equipment. It does not manufacture industrial control equipment, and, similar to Honeywell, it does not manufacture board components. PSI provides board services for customers who own systems manufactured by Honeywell's competitors by purchasing the necessary components from either the equipment or component manufacturer. J.A. at 356–60. It is also able to obtain any firmware and documentation necessary for the non-generic components either from the manufacturer's marketing information or by purchasing this

to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court." 15 U.S.C. § 2.

information from the manufacturer. J.A. at 359–60.

Because PSI is unable to obtain any of the components manufactured exclusively for Honeywell, it is, for all practical purposes, unable to compete in the market for repair of Honeywell boards. Indeed, the district court took judicial notice of this fact. J.A. at 396–97. The record contains ample evidence that without this restriction, PSI could effectively compete in the market for Honeywell board repair work. PSI's economic expert expressed the opinion that in an unrestrained market, PSI's market share should be as high as twenty-seven percent. J.A. at 1005. In addition, PSI's chief operating officer, Eugene Laurie, testified at the district court's evidentiary hearing about the numerous Honeywell equipment owners that have asked PSI to perform board repairs, only to find out that, because of Honeywell's restrictive policy, PSI may not be able to repair their board. J.A. at 373–76. While the district court apparently did not reject these contentions, it did not find them determinative in its analysis.

The district court granted Honeywell's motion for summary judgment on the § 1 tying claim because it found that there were not two separate products that could be tied. It stated in its order addressing the § 1 claim that "there are not separate markets for parts for the circuit boards manufactured by defendant and for the servicing of circuit boards when a board requires repair or replacement." District Ct. Order Dismissing § 1 Claim at 2–3. In granting Honeywell's motion for summary judgment on the § 2 claim, the court declared: "Here the only thing defendant has done is maintain its right to proprietary technology by declining to make available to the market the proprietary components that make up part of its circuit boards. Under such circumstances there is no genuine issue of material facts which is ripe for jury determination." District Ct. Order Dismissing § 2 claim at 3. As we explain at length below, the § 1 ruling was incorrect. But as we also explain, the primary equipment market, not any aftermarket, is the relevant market in this case for purposes of §§ 1 and 2. Because of this

conclusion, the district court's § 2 analysis is no longer applicable in this case. Our relevant market analysis, however, leads us to conclude that summary judgment nonetheless was proper on both claims.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *See City of Mount Clemens v. EPA,* 917 F.2d 908, 914 (6th Cir.1990); *Pinney Dock & Transp. Co. v. Penn Cent. Corp.,* 838 F.2d 1445, 1472 (6th Cir.), *cert. denied,* 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether the non-moving party has raised a genuine issue of material fact, "[t]he evidence of [appellant] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 2076, 119 L.Ed.2d 265 (1992) (citations omitted). Prior to *Kodak,* there had been some debate whether *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), placed special burdens on antitrust plaintiffs responding to summary judgment challenges. But this debate was resolved in *Kodak,* when the Court stated: "*Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision." 504 U.S. at 468, 112 S.Ct. at 2083. We therefore now turn to the evidence in the record, construing it in a light most favorable to PSI, in order to determine whether it raises a genuine issue of material fact and whether PSI's inferences from this evidence are reasonable.

## III. THE TYING CLAIM

Appellant alleges that Honeywell has violated § 1 of the Sherman Act through an impermissible tying arrangement. In particular, PSI contends that Honeywell has

illegally tied the sale of its circuit-board components to its circuit-board repair services. "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" *Kodak*, 504 U.S. at 461, 112 S.Ct. at 2079 (quoting *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)). Such an arrangement constitutes an impermissible tie under § 1 of the Sherman Act "if the seller has 'appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Id.* at 462, 112 S.Ct. at 2079.[2] While a substantial amount of commerce is potentially involved, Honeywell disputes both the existence of two separate products and market power.

## A. Separate Products

◼ For the district court's grant of summary judgment to be reversed, PSI must first show that a reasonable trier of fact could find that circuit-board components and service are two distinct products. Our analysis of this issue is controlled largely by the Supreme Court's decisions in *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), and *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). In *Kodak*, the plaintiffs, a group of independent service organizations (ISOs), contended that Kodak had illegally tied the sale of replacement parts for its photocopiers and micrographic equipment to the service of such equipment. Because of Kodak's unique parts and its restrictive policy, the ISOs could not perform the repairs on Kodak machines. Kodak contended that parts and service could not constitute separate products under § 1 of the Sherman Act. In rejecting this contention, the Court remarked that parts and service could be separate products if there is "sufficient consumer demand so that it is efficient for a firm to provide service separately from parts." 504 U.S. at 462, 112 S.Ct. at 2080.

The consumer-demand test articulated in *Kodak* merely clarified what had already been decided in *Jefferson Parish*. In *Jefferson Parish*, the plaintiff, an anesthesiologist, alleged that the defendant hospital's exclusive contract with a firm of anesthesiologists was an illegal tie under § 1. The hospital responded that it was "merely providing a functionally integrated package of services." 466 U.S. at 19, 104 S.Ct. at 1561–62. Rejecting the hospital's argument, the Court stated that, in determining whether one or two products is involved, the focus should be "not on the functional relation between them, but rather on the character of the demand for the two items." *Id.* Indeed, as the *Kodak* Court stated, "We have often found arrange-

2. While PSI argues on appeal that Honeywell's tying arrangement is illegal under both per se and rule-of-reason analysis, these two theories have, in effect, merged in recent years. Under traditional per se analysis, restraints of trade were condemned without any inquiry into the market power possessed by the defendant. *See, e.g., Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). However, under tying's per se rule, the seller must possess substantial market power in the tying product market. In addition, tying's per se rule provides for an inquiry into whether the defendant's conduct has procompetitive effects. *See Kodak*, 504 U.S. at 478–79, 112 S.Ct. at 2088–89. Such an extensive factual inquiry is hardly the stuff of per se analysis. Under rule-of-reason analysis, the antitrust plaintiff must show, inter alia, an adverse effect on competition. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29–30, 104 S.Ct. 1551, 1567–68, 80 L.Ed.2d 2 (1984). This circuit adopted the following three-step analysis for determining whether a tying arrangement is likely to cause such an anticompetitive effect: "(1) the seller must have power in the tying product market; (2) there must be a substantial threat that the tying seller will acquire market power in the tied-product market; and (3) there must be a coherent economic basis for treating the tying and tied products as distinct." *Hand v. Central Transp., Inc.*, 779 F.2d 8, 11 (6th Cir.1985). Thus, in this circuit, market power in the tying product market is an indispensable requirement under either per se or rule-of-reason analysis. As Professors Areeda, Elhauge, and Hovenkamp comment, "the per se rule against tying is 'per se' in only one respect—namely, dispensing with proof of anticompetitive effects...." 10 PHILLIP E. AREEDA ET AL., ANTITRUST LAW ¶ 1760e, at 372 (1996). The merger of these two theories is apparent in the majority opinion in *Kodak*, which does not even mention the terms "per se" or "rule of reason," even though *Kodak* was technically a per se case.

ments involving functionally linked products at least one of which is useless without the other to be prohibited tying devices." 504 U.S. at 463, 112 S.Ct. at 2080 (quoting *Jefferson Parish*, 466 U.S. at 19 n. 30, 104 S.Ct. at 1562 n. 30). With *Jefferson Parish* and *Kodak* as our guide, we now turn to the facts of this case.

Honeywell first contends that it does not even sell repair services, the tied product in this case. It claims that instead of servicing a defective circuit board, it simply replaces the board with a new or refurbished one, charging the same price for all similar replacement boards, regardless of the problem with the defective board. Honeywell, however, cannot claim that it does not participate in the repair business simply because the replacement board it gives a customer is not the same one the customer returned. Honeywell has decided that it is more cost-effective to replace a board immediately and then later to determine whether the board is worth repairing than to attempt to repair the same board returned by its customer. But this decision does not alter the fact that Honeywell repairs a substantial number of the boards that are returned. Simply put, there is substantial evidence that Honeywell repairs circuit boards.

Honeywell next contends that even if its practices reasonably can be characterized as involving repair services, separate markets for components and board services do not exist because consumers simply demand functioning replacement boards. We agree with Honeywell that its customers want functioning boards. In *Kodak*, the consumers certainly wanted functioning photocopiers, just as all consumers want functioning products. Yet this elementary conclusion had no bearing on the *Kodak* Court's inquiry into whether parts and services could be distinct products for antitrust purposes in that case. Similarly, Honeywell's characterization of its customers' needs moves us no closer to the resolution of the separate-products issue in this dispute.

What does aid our analysis in this case is the evidence in the record suggesting that it would be efficient for a firm to provide some component parts separate from circuit-board repair services. PSI's very existence indicates the possibility of a separate market for service, because PSI does not manufacture any of the component parts for the circuit boards but instead purchases them from third-party manufacturers. *See Kodak*, 504 U.S. at 462, 112 S.Ct. at 2080 ("[T]he development of the entire high-technology service industry is evidence of the efficiency of a separate market for service."). There is also evidence in the record that it is not uncommon for other control-equipment manufacturers to sell circuit-board components. J.A. at 1201. Moreover, the record contains evidence that some circuit-board repair services do not even involve the purchase of components. J.A. at 1203–04. In addition, Honeywell admits that the generic components on its circuit boards—roughly 95% of the components—are available for sale either directly through the manufacturer or a third-party distributor. J.A. at 224.

Indeed, Honeywell itself sells components for its PLC equipment to customers and admits allowing one customer to purchase TDC components from it. In describing the latter situation, Edward Hurd, Honeywell's President of Industrial Control indicated that a "concession" was made in its policy to one customer. J.A. at 295–96. From the record before us, it appears that other Honeywell customers would welcome a similar concession. PSI's industry expert indicated that without Honeywell's component-part restrictions, PSI's repair market for Honeywell equipment would be twenty-seven percent. J.A. at 1005. The same expert also conducted a survey indicating that fifteen percent of Honeywell customers have purchased and continue to purchase component parts from Honeywell without purchasing circuit-board repair services. J.A. at 1003. While Honeywell contends that only one customer continues to purchase its component parts, this contention, when compared to the PSI survey, creates an issue of material fact that we are not in a position to resolve at the summary judgment stage.

More important, however, Honeywell's own actions have essentially limited the existence of a separate market for components. On this point, *Allen–Myland, Inc. v. IBM*, 33

F.3d 194 (3rd Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 684, 130 L.Ed.2d 615 (1994), is instructive. At issue in *Allen–Myland* was a "net pricing policy" by the defendant, which essentially required IBM customers to purchase computer upgrades and upgrade installation together. On a few occasions, however, IBM allowed customers to purchase the upgrade parts separately. IBM then contended that because only a few upgrades were sold apart from service, no separate market existed for service. In rejecting this argument, the Third Circuit stated that "the fact a few ... upgrades were sold [separately from the installation] does not prove that there was no separate demand for installation services, particularly considering that IBM had every economic incentive to protect its revenues and avoid widely publicizing the existence of such upgrades." *Id.* at 214. Similarly, Honeywell cannot point to its one customer that purchases components separately as evidence of a lack of a market for components, when it was Honeywell's own restrictive policy that assured the absence of a component market.

As a final argument, Honeywell asserts that a decision in favor of PSI here would expand § 1 to include virtually all parts of finished products, since very few products do not contain sub-parts of some kind. Honeywell's concerns are not without merit. *See Jefferson Parish,* 466 U.S. at 39, 104 S.Ct. at 1572 (O'Connor, J., concurring) ("All but the simplest products can be broken down into two or more components that are 'tied together' in the final sale."). While we are mindful of the various efficiency gains that can accrue to both suppliers and customers from bundling certain products together, *see* 9 PHILLIP E. AREEDA, ANTITRUST LAW ¶ 1717b, at 214–18 (1991), we are confident that the antitrust laws provide the tools to distinguish between meritorious and non-meritorious claims. As a threshold matter, an antitrust plaintiff must be able to show that competition—as opposed to competitors—is harmed by the bundling of products. *See, e.g., HyPoint Tech., Inc. v. Hewlett–Packard Co.,* 949 F.2d 874, 878 (6th Cir. 1991), *cert. denied,* 503 U.S. 938, 112 S.Ct. 1480, 117 L.Ed.2d 623 (1992) ("The antitrust laws were enacted for 'the protection of *com-*

*petition,* not *competitors.'* ") (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (emphasis in original)). Moreover, the Sherman Act is not triggered merely by the presence of component parts, but only when there is sufficient demand for these parts such that it would be efficient for a firm to provide them separately. *See Kodak,* 504 U.S. at 462, 112 S.Ct. at 2079–80. As the above discussion indicates, a question of fact exists in this case on this very point. We conclude, therefore, that the district court improperly relied on the lack of separate products as a basis for granting summary judgment in favor of Honeywell on PSI's § 1 claim.

## B. Market Power

We must now consider the next feature of an illegal tying arrangement: appreciable economic power in the tying market. The district court did not address this issue, having based its § 1 ruling on its finding that there were not separate products. Nonetheless, Honeywell contends that because it lacks market power, this is an alternative basis for granting summary judgment in its favor.

"Market power is the power 'to force a purchaser to do something that he would not do in a competitive market.' It has been defined as 'the ability of a single seller to raise price and restrict output.' The existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market." *Kodak,* 504 U.S. at 464, 112 S.Ct. at 2081 (citations omitted). "Accordingly, the proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market." *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 504, 89 S.Ct. 1252, 1259, 22 L.Ed.2d 495 (1969). If the seller has sufficient market power in the tying market to "force" the customer to purchase the tied product then "competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Jefferson*

*Parish,* 466 U.S. at 12, 104 S.Ct. at 1558. The market power requirement is important because, without market power, a seller cannot engage in the forcing necessary to establish a § 1 violation. A thirty-percent share of the market, standing alone, provides an insufficient basis from which to infer market power. *Id.* at 26–29, 104 S.Ct. at 1565–67. With this background in mind, we turn to the parties' asserted definitions of the relevant market in this case.

■■■■■ PSI contends that Honeywell-brand components comprise the relevant market, since these components are not interchangeable with any other components offered in the market. It alleges that Honeywell has enough market power in the component market to force the undesired purchase of Honeywell board services. Honeywell, on the other hand, argues that the relevant market consists of either the market for all components used on its boards or the primary equipment market. Honeywell first claims that PSI is bound by a relevant market including all board-level components because this is how PSI has defined the relevant market until this appeal. While neither party has been exceptionally clear in its proposed definition of the relevant market, both PSI's amended complaint and its appellate brief indicate that it considers the relevant market to consist of only the Honeywell-brand circuit-board components. *See* First Am. Compl. ¶ 15; Appellant's Br. at 38.[3]

Honeywell's real argument is that the relevant market should be defined to include all of the manufacturers of industrial control equipment with whom it competes. It contends that even if it possesses market power in the component market, competition in the primary equipment market precludes it

from exercising this monopoly power. This was the precise argument presented by the defendant to the Court in *Kodak.* Defendant Kodak asked the Supreme Court to adopt a legal rule that "equipment competition precludes any finding of monopoly power in derivative aftermarkets." *Kodak,* 504 U.S. at 466, 112 S.Ct. at 2082.[4] In arguing against such a rule, the ISOs contended that information costs and switching costs prevented the competition in the primary market from constraining Kodak's ability to exact supracompetitive prices in the aftermarket. Information costs are costs that prevent consumers from obtaining all relevant information about a product at the time of sale. Switching costs are borne by customers who have already purchased a product and who would then incur some cost in switching to another product. Information and switching costs were particularly high in *Kodak* because Kodak adopted its parts-restrictive policy after numerous customers had already purchased Kodak copiers, thus creating a "lock-in" effect. Agreeing with the ISOs' theory that many Kodak customers were potentially "locked-in," the Court concluded that there was "a question of fact whether information costs and switching costs foil the simple assumption that the equipment and service markets act as pure complements to one another." *Id.* at 477, 112 S.Ct. at 2087.

Honeywell first contends that the Court in *Kodak* refused to uphold the grant of summary judgment largely because of the limited evidentiary record in *Kodak.* In *Kodak,* summary judgment was granted after a brief discovery period and without a hearing. *Id.* at 459, 112 S.Ct. at 2078. While Honeywell correctly concludes that the Court did not hold that summary judgment was never appropriate in aftermarket cases, neither did

---

3. Honeywell's reasons for attempting to constrain PSI to a relevant market consisting of all components on Honeywell boards are obvious, since ninety-five percent of the components on its boards are widely available in the market. Nevertheless, it is questionable whether such a market definition would benefit Honeywell. Even though market power is normally established by controlling a substantial share of the market, market power also exists "when the seller offers a unique product that competitors are not able to offer." See *Jefferson Parish,* 466 U.S.

at 17, 104 S.Ct. at 1561. In this case, Honeywell itself describes its own board components as "proprietary," and there is substantial evidence that competitors are unable to offer these components.

4. In Kodak the Court found that the ISOs had conceded that Kodak lacked market power in the equipment market. *Kodak,* 504 U.S. at 465 n. 10, 112 S.Ct. at 2081 n. 10.

the Court hold that a more complete record would assure Kodak of summary judgment. Regardless of the size of the record after discovery, if a material issue of fact exists, summary judgment is inappropriate.

Honeywell's next attempt to distinguish *Kodak* has much more merit. It contends that while Kodak changed its service and parts policy to include the tie after many Kodak customers purchased their equipment, Honeywell has consistently maintained its policy of board replacement. While Honeywell does not clearly articulate why this distinction is important, we interpret Honeywell's argument to be that the *Kodak* Court's finding of a material issue of fact on the definition of the relevant market resulted from Kodak's change in policy. PSI, on the other hand, argues that even without a change in policy, significant information costs still exist. It points to deposition testimony by Honeywell's own personnel that it would be "very difficult" for customers to determine the life-cycle cost of its equipment. J.A. at 1347. There is also evidence in the record that it would be difficult for Honeywell to predict the cost of parts down the road. J.A. at 1344. And while Honeywell equipment owners may know that Honeywell's equipment is often capable of lasting for the lifetime of the plant, the owners are constantly upgrading and enhancing the equipment along the way, so that these costs are difficult to gauge. J.A. at 1354–55.

The Court in *Kodak* did not explicitly state the extent to which Kodak's change in policy affected the Court's analysis. Nonetheless, it suggested that the outcome might have been different had Kodak presented evidence that its restrictive parts policy was consistently maintained and generally known. In responding to Justice Scalia's dissent, which argued, inter alia, that but for Kodak's change in policy, the Court would be faced with a traditional tie between copiers and aftermarket service, the majority responded:

> The dissent disagrees [with our conclusion in this case] based on its hypothetical case of a tie between equipment and service. "The only thing lacking" to bring this case within the hypothetical case, states the dissent, "is concrete evidence that the re-

strictive parts policy was ... generally known." But the dissent's "only thing lacking" is the crucial thing lacking—evidence. Whether a tie between parts and service should be treated identically to a tie between equipment and service, as the dissent and Kodak argue, depends on whether the equipment market prevents the exertion of market power in the parts market. Far from being "anomalous," requiring Kodak to provide evidence on this factual question is completely consistent with our prior precedent.

504 U.S. at 477 n. 24, 112 S.Ct. at 2087 n. 24 (internal citations omitted). This passage can be read to imply that had Kodak presented undisputed evidence that it never changed its policy and that its policy was generally known, the Court would have considered Kodak copiers as the tying product and service and parts combined as the product being tied. *See* 10 PHILLIP E. AREEDA, ET AL., ANTITRUST LAW ¶ 1740c, at 150 (1996) ("The majority [in *Kodak*] apparently agreed with [the dissent] when it emphasized the absence of evidence that Kodak's policy was generally known."); *id.* at 157 ("[T]he *Kodak* majority indicated that it would assess the defendant's power in the interbrand machine market (where it had none) were it 'generally known' to machine buyers that the defendant supplied unique repair parts only in connection with its service, notwithstanding ignorance of lifecycle prices.").

Both the First and the Seventh Circuits have interpreted *Kodak* to be limited to situations in which the seller's policy was not generally known. *See Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 763 (7th Cir.1996) ("The Court did not doubt in *Kodak* that if spare parts had been bundled with Kodak's copiers from the outset, or Kodak had informed customers about its policies before they bought its machines, purchasers could have shopped around for competitive life-cycle prices. The material dispute that called for a trial was whether the change in policy enabled Kodak to extract supra-competitive prices from customers who had already purchased its machines."); *Lee v. Life Ins. Co. of North America*, 23 F.3d 14, 20 (1st Cir.), *cert. de-*

nied, —— U.S. ——, 115 S.Ct. 427, 130 L.Ed.2d 340 (1994) ("[T]he timing of the 'lock in' at issue in *Kodak* was central to the Supreme Court's decision.... Had previous customers known, at the time they bought their Kodak copiers, that Kodak would implement its restrictive parts-servicing policy, Kodak's 'market power,' i.e., its leverage to induce customers to purchase Kodak servicing, could only have been as significant as its [market power] in the copier market, which was stipulated to be inconsequential or nonexistent.").

We likewise agree that the change in policy in *Kodak* was the crucial factor in the Court's decision. By changing its policy after its customers were "locked in," Kodak took advantage of the fact that its customers lacked the information to anticipate this change. Therefore, it was Kodak's own actions that increased its customers' information costs. In our view, this was the evil condemned by the Court and the reason for the Court's extensive discussion of information costs. While PSI's argument seems to suggest that *Kodak* supports a finding of market power whenever information costs are present, such a position cannot be reconciled with *Jefferson Parish*. In *Jefferson Parish*, the plaintiff argued there were various "market imperfections" that enabled the hospital to charge noncompetitive prices and that saddled the consumers with inadequate information, which in turn "render[ed] consumers unable to evaluate the quality of the medical care provided by competing hospitals." 466 U.S. at 27, 104 S.Ct. at 1566. Dismissing this argument, the Court responded that "[w]hile these factors may generate 'market power' in some abstract sense, they do not generate the kind of market power that justifies condemnation of tying." *Id.* Put another way, the Court rejected the premise that imperfect consumer information resulting from basic market imperfections could be used as a basis to infer market power for purposes of the Sherman Act. We are unwilling to conclude that *Kodak* overruled this portion of *Jefferson Parish*, especially because the Court in *Kodak* cites *Jefferson Parish* with approval in its general discussion of market power. *Kodak*, 504 U.S. at 464, 112 S.Ct. at 2080–81.

In light of our reading of *Jefferson Parish* and *Kodak*, we thus hold that an antitrust plaintiff cannot succeed on a *Kodak*-type theory when the defendant has not changed its policy after locking-in some of its customers, and the defendant has been otherwise forthcoming about its pricing structure and service policies. This rule should encourage manufacturers to divulge all relevant information at the time of sale. While we recognize that some information costs will still exist even with full disclosure by a seller, *see* Mark R. Patterson, *Product Definition, Product Information, and Market Power: Kodak in Perspective,* 73 N.C.L.REV. 185, 215–216 (1994) ("The buyer's pre-purchase knowledge of a tie allows her only to anticipate those additional costs of the tie about which she knows prior to the purchase; it does not reduce the effects of the information costs that prevented buyers of Kodak equipment from accurately determining life-cycle prices."), these additional information costs stem from the fact that our economy is not one of perfect information, a factor that alone should not invoke antitrust condemnation. Accepting PSI's argument would expose many manufacturers of durable, expensive equipment to potential antitrust liability for having inherent power over the aftermarkets of their products, a result certainly not intended by *Kodak* and not consistent with *Jefferson Parish*.

The present dispute provides an ideal example as to how our reading of *Kodak* can be applied in practice. In this case, there are no allegations that Honeywell changed its parts-restrictive policy in order to lock-in customers, nor has PSI alleged that Honeywell's policy was not generally known. There also is evidence that Honeywell and its customers engage in lengthy negotiations before the sale of Honeywell equipment. J.A. at 270. This fact is hardly surprising in light of the substantial price of the equipment. The record also contains evidence that Honeywell will provide estimates of service costs and failure rates of various parts if asked by its customers, J.A. at 1339, 1342, and that it offers various service plans to enable the customers more accurately to estimate the cost of the equipment. J.A. at 974–

76. All of these actions by Honeywell reduce the information costs faced by its consumers. If there were any evidence in the record that Honeywell took advantage of its customers' imperfect information in order to reap supracompetitive profits in the aftermarkets for its equipment, we would not hesitate to allow a *Kodak*-type theory to be submitted to the jury. However, we can find nothing in the record or PSI's brief that alleges that Honeywell engaged in such activities. In this situation a *Kodak*-type theory is not applicable. Since PSI has not alleged or shown that Honeywell has market power in the relevant market—the primary equipment market—summary judgment is appropriate in favor of Honeywell on PSI's § 1 claim.

## IV. THE MONOPOLY CLAIM

PSI contends the district court erred by granting summary judgment in favor of Honeywell on PSI's § 2 monopoly claim. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Kodak,* 504 U.S. at 481, 112 S.Ct. at 2089 (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)). As was the case in *Kodak,* our § 1 analysis of the relevant market largely dictates our § 2 conclusion on this issue as well. Thus, our conclusion that the relevant market in this case is the primary equipment market is equally applicable here. Section 2 does, however, require a greater market share for a finding of market power than does § 1. *Kodak,* 504 U.S. at 481, 112 S.Ct. at 2089–90; *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 502, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969). While there is no magical percentage of market power that will qualify as monopoly power under § 2, the Supreme Court has concluded that an 87% share of the market and over two-thirds of the market both constitute monopoly power under § 2. *See United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966) (87%

of market constitutes a monopoly); *American Tobacco Co. v. United States,* 328 U.S. 781, 797, 66 S.Ct. 1125, 1133, 90 L.Ed. 1575 (1946) (over two-thirds of market constitutes a monopoly).

In this case, PSI alleges that Honeywell possesses monopoly power in the market for circuit-board repair services, and that it willfully acquired this monopoly power by restricting the availability of its brand of circuit-board components. While the district court made no findings regarding the relevant market, it concluded that Honeywell had an absolute right to refuse to deal in its proprietary components, and that, because of this fact, Honeywell had legitimate reasons for acquiring whatever market power it had. In other words, the district court concluded that even if Honeywell had monopoly power in the market for circuit-board repair services, it achieved that power as a result of legitimate reasons, namely the proprietary nature of its components. In light of our holding on the relevant-market issue, however, the district court's analysis, which focused on Honeywell's reasons for acquiring and maintaining power in the market for circuit-board repair services, is no longer applicable. Because we have limited the relevant market in this case to the primary equipment market, PSI can no longer rely on any power that Honeywell may have in the market for circuit-board components and repair services as a basis for § 2 liability. Therefore, because PSI has not shown that Honeywell possesses market power in the relevant market, i.e., the primary equipment market, summary judgment likewise was appropriate in favor of Honeywell on the § 2 claim.

Even if PSI had produced evidence regarding Honeywell's share of the primary equipment market, and even if we assume, for summary judgment purposes, that Honeywell has monopoly power in the market for its equipment, PSI must satisfy the second part of the § 2 analysis, i.e., it must show that Honeywell willfully acquired or maintained this alleged monopoly power. *Kodak,* 504 U.S. at 481, 112 S.Ct. at 2089–90. This requirement of proving exclusionary

conduct also poses an insurmountable obstacle for PSI.

  PSI's entire theory in this case revolves around Honeywell's practices in the circuit-board repair market. As stated throughout this opinion, PSI contends that Honeywell's domination of the market for Honeywell-brand components has foreclosed PSI from the repair market for Honeywell circuit boards. Nowhere does PSI allege that Honeywell willfully sought to acquire monopoly power in the market for industrial control equipment, a market in which PSI does not compete and does not seek to enter. Nor does PSI contend that Honeywell's parts-restrictive policy has allowed Honeywell to achieve and maintain monopoly power in the market for industrial control equipment. *See* 3 PHILLIP AREEDA & DONALD F. TURNER, ANTITRUST LAW ¶ 626c (1978) (" '[E]xclusionary' behavior should be taken to mean conduct other than competition on the merits, or other than restraints reasonably 'necessary' to competition on the merits, *that reasonably appear[s] capable of making a significant contribution to creating or maintaining monopoly power.*") (emphasis added). If anything, a restrictive service policy would encourage competition in the primary equipment market. PSI, therefore, cannot establish that Honeywell's practices in the parts and services markets—not relevant markets in this dispute—have contributed to Honeywell's power in the market for industrial control equipment. Therefore, PSI fails the second part, as well as the first part, of the § 2 analysis.

## V. CONCLUSION

We conclude that because Honeywell's parts-restrictive policy has been consistently maintained and generally known, and because Honeywell has otherwise been forthcoming about its pricing structure and service policies, the primary equipment market in this case comprises the relevant market for purposes of both §§ 1 and 2 of the Sherman Act. Accordingly, relying on these grounds, since PSI has not alleged or shown that Honeywell has market power in the relevant (primary equipment) market, we **AFFIRM** the judgment of the district court.