United States Court of Appeals
For the First Circuit

No. 99-1009

SMS SYSTEMS MAINTENANCE SERVICES, INC.,

Plaintiff, Appellant,

v.

DIGITAL EQUIPMENT CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]

Before

Torruella, Chief Judge,

Campbell, Senior Circuit Judge,

and Selya, Circuit Judge.

Ronald S. Katz, with whom Anne Fiero, Coudert Brothers, Ronald
F. Kehoe, and Warner & Stackpole LLP were on brief, for appellant.
J. Anthony Downs, with whom Shepard M. Remis, P.C., Anthony S.
Fiotto, and Goodwin, Procter & Hoar LLP were on brief, for
appellee.

August 19, 1999

SELYA, Circuit Judge. In a complaint filed in the United
States District Court for the District of Massachusetts, SMS
Systems Maintenance Services, Inc. (SMS) accused Digital Equipment
Corporation (DEC) of violating Section 2 of the Sherman Act, 15
U.S.C. 2, by integrating three-year warranties with sales of
computer systems. SMS, an equipment servicer, asserted that
deploying warranties in this manner unfairly constrained consumers'
ability to choose their preferred service providers and thereby
paved the way for a monopoly in the services aftermarket for DEC
computers. The district judge granted summary judgment in DEC's
favor. See SMS v. DEC, 11 F. Supp.2d 166 (D. Mass. 1998). 
Although our reasoning does not mirror that of the lower court, we
nonetheless affirm.
I
We sketch the facts, viewing them as favorably to SMS as
reason and the record will permit. See Conward v. Cambridge Sch.
Comm., 171 F.3d 12, 17 (1st Cir. 1999) (articulating summary
judgment standard). We furnish additional details as they become
relevant to the ensuing analysis.
DEC manufactures an array of hardware, ranging from
personal computers (PCs) to mainframes. In the market for mid-
range computers, DEC battles other heavyweights (e.g., IBM, Sun
Microsystems, and Hewlett-Packard) for the attention and affection
of consumers. In April 1994, DEC introduced its "Alpha" line,
consisting largely of mid-range servers. These models were more
powerful and more versatile than their predecessors and embodied
certain distinctive technological advances. DEC included a three-
year warranty as part of the mid-range Alpha package. Although
multi-year warranties for PCs had become standard fare in the early
1990s, a three-year warranty in the mid-range server market was
uncommon in 1994. One-year warranties were the norm indeed, DEC
itself provided a one-year warranty in respect to its pre-Alpha
products and continued to offer one-year warranties in connection
with sales of its established "VAX" line of mid-range computers
even after it introduced the Alpha models.
DEC's conception of a warranty as an instrument of
competition is scarcely original. See, e.g., 3A Phillip E. Areeda
& Herbert Hovenkamp, Antitrust Law, 761, at 55 (1996) (referring
to warranty protection as a tool of "non-price competition" that
has particular importance for firms competing in robust product-
differentiated markets for durable equipment). A warranty
functions essentially as an insurance policy. See generally Thomas
J. Holdych and Bruce D. Mann, The Basis of the Bargain Requirement: 
A Market and Economic Based Analysis of Express Warranties, 45
DePaul L. Rev. 781, 794-99 (1996). The customer pays the purchase
price and receives not only the purchased product itself but also
the manufacturer's promise to repair defects and supply replacement
parts without extra charge (usually under certain conditions and
during a certain interval). Because a warranty is a mechanism
through which a consumer can protect himself against the
uncertainties inherent in owning a product that likely will require
parts and service over time, the product's allure increases as the
warranty terms become more generous. This attraction is magnified
in some cases because a strong warranty signals a manufacturer's
faith in the quality of its product. In theory, then, warranties
boost sales (and, ultimately, profits).
Given this general experience, SMS's claim that DEC's
warranty is anticompetitive appears odd at first blush. There is,
however, a certain offbeat logic to SMS's position. The
aftermarket for servicing computers is both dynamic and lucrative. 
While manufacturers usually seek to service the hardware that they
produce, other firms compete with them for this business. Many of
these independent service organizations (ISOs) operate nationally
or regionally and some specialize in servicing particular brands of
equipment. A manufacturer's customers may in fact prefer to use
these ISOs for a variety of reasons, including loyalty,
convenience, response time, pricing, and perceived quality of
service.
Against this backdrop, SMS an ISO that operates
nationally and specializes in servicing DEC equipment puts a
sinister cast on DEC's introduction of "mandatory" warranties (that
is, warranties that accompany the product at no extra charge). SMS
contends that current users of DEC equipment, known in the industry
argot as its "installed base," are effectively "locked-in" to
buying DEC computers in the future because of the magnitude of
their sunk costs (e.g., outlays related to training employees to
work with DEC systems and to the acquisition of expensive software
that is compatible with those systems). This lock-in phenomenon,
SMS warns, creates an environment in which a warranty can function
as a vehicle for aftermarket monopolization by creating a
disincentive for computer purchasers to consult service firms other
than the manufacturer itself. In SMS's view, a purchaser who has
a warranty will not readily take his service business to an ISO
because no consumer wants to pay twice for the same service and
the longer the warranty, the less the opportunity for ISOs to
compete. SMS predicts that, if such practices are left unchecked,
lost business opportunities will ruin ISOs, eliminate competition,
and eventually enable manufacturers to raise aftermarket prices.
II
Before moving to an analysis of SMS's claim, we must put
a Trojan horse out to pasture. DEC suggests that this case
involves only a "single product," because the challenged three-year
warranty is nothing but an "attribute" of the hardware. If this
were true, the primary equipment market would constitute the
relevant market and DEC's share of it (according to its estimates,
at least) would be far below what SMS would need to show a credible
threat of monopolization, and, thus, the case would vanish quietly
into the night.
The single product defense is customarily invoked to
rebut allegations of an illegal tie brought under Section 1 of the
Sherman Act (15 U.S.C. 1). See, e.g., Jefferson Parish Hosp.
Dist. No. 2 v. Hyde, 466 U.S. 2, 18-25 (1984). In the context of
SMS's Section 2 monopoly claim, DEC appears to wield the defense in
a different manner, i.e., as a means of eliminating the possibility
that its warranty has any relevant connection with the services
aftermarket. Although we are tempted to dismiss DEC's assertion
simply as a matter of common sense, the best indication of its
infirmity resides in the record.
The success of a single product defense ordinarily hinges
on observations of actual market practices. If evidence shows that
there is significant demand for separate components of what is
alleged to be a single product and the product is in fact sold in
those forms, there is no single product. See Eastman Kodak Co. v.
Image Tech. Servs., Inc., 504 U.S. 451, 462-63 (1992); 10 Areeda &
Hovenkamp, supra, 1744, at 203. Conversely, if all or
substantially all competing firms always or almost always
(discounting occasional accommodations for customers with special
needs) sell two seemingly separate items together, then the two
attributes may be treated as components of a single product. See
generally 10 Areeda & Hovenkamp, supra, 1744, at 197-98.
In mounting its single product defense, DEC relies
heavily on the affidavit of Professor Jerry Hausman, a
distinguished economist, who explains uncontroversially that
warranties are tools used by manufacturers to promote the
attractiveness of their products and thus to gain a competitive
edge. Using this statement as a springboard, DEC vaults to the
conclusion that hardware and warranty are a single product. But
DEC leaps without looking. The record is pellucid that, while some
other computer manufacturers bundle warranties with their machines,
the practice, especially with regard to mid-range computers, is
anything but universal.
Vendors of mid-range computers offer a variety of
ancillary packages with their products, including service
contracts, warranties of differing lengths, or nothing at all. 
Indeed, a DEC official, Jane Heaney, affirmed in the course of
pretrial discovery that differing service packages are items that
customers can (and do) use to differentiate between competing
computer brands. In competitive markets, suppliers' offerings
generally reflect consumer demand. See, e.g., Digital Equipment
Corp. v. Uniq Digital Tech., Inc., 73 F.3d 756, 762 (7th Cir.
1996). We therefore conclude at least for the purpose of summary
judgment that the mid-range computer market treats warranty and
equipment as separate products.

III
Having laid to rest DEC's attempt to shortstop the
requisite analysis, we turn to the parameters of SMS's burden. To
prove a violation of Section 2 of the Sherman Act, the plaintiff
must show both that the defendant has monopoly power in a relevant
market and that it has maintained or increased that power through
anticompetitive conduct. See United States v. Grinnell Corp., 384
U.S. 563, 570-71 (1966); Town of Concord v. Boston Edison Co., 915
F.2d 17, 21 (1st Cir. 1990); Olympia Equip. Leasing Co. v. Western
Union Tel. Co., 797 F.2d 370, 373 (7th Cir. 1986). SMS's
monopolization hypothesis begins with the proposition that, before
all else, we must define the relevant market. Relying on
traditional product market definition cases, see Brown Shoe Co. v.
United States, 370 U.S. 294, 325 (1962); United States v. E.I. du
Pont De Nemours & Co., 351 U.S. 377, 404 (1956), SMS contends that,
because DEC's aftermarket products are "unique" and servicing DEC
computers requires specialized expertise, the relevant market must
be the aftermarket for servicing DEC mid-range servers.
The argument, if successful, would place SMS at a
distinct advantage. Market share often serves as a proxy for
market power. See, e.g., Town of Concord, 915 F.2d at 30;
Grappone, Inc. v. Subaru of New Engl., Inc., 858 F.2d 792, 797 (1st
Cir. 1988). If we were to agree with SMS that the relevant market
is DEC's aftermarket for services, then, given that DEC
predominates in that market (as evidenced by its large market
share), SMS would have traveled far on the road to establishing
DEC's monopoly power. But we believe that SMS's single-minded
focus on traditional concepts of product market definition
oversimplifies the route it must take. Cases involving
aftermarkets are sui generis.
The purpose of defining a relevant market is to assist in
determining whether a firm has market power. See Israel Travel
Advisory Serv., Inc. v. Israel Identity Tours, Inc., 61 F.3d 1250,
1252-53 (7th Cir. 1995); see also U.S. Healthcare Inc. v.
Healthsource, Inc., 986 F.2d 589, 598 (1st Cir. 1993) (noting the
importance of remembering what antitrust question the court is
trying to answer when it engages in market definition). In its
most basic iteration, the monopolist's market power consists of
having sufficient economic muscle to permit it to raise prices well
in excess of competitive levels without inducing customers to turn
elsewhere. See Town of Concord, 915 F.2d at 31. It follows
inexorably that a traditional product or geographic market
definition exercise would be the starting point in an aftermarket
case if, but only if, a large market share in such a derivative
market invariably translated into (or at least reliably indicated)
monopoly power in that market.
This condition does not obtain as a matter of course. 
Most firms that service their manufactured products can be expected
to have a very high percentage of the services aftermarket for
those products. See generally Daniel Wall, Aftermarket Monopoly
Five Years After Kodak, 11 Antitrust 32, 32-33 (1997). Virtually
by definition, manufacturers possess relative expertise in
repairing their own products (an expertise that increases in
importance as the good increases in technological complexity) and
consumers typically are reluctant to incur the transaction costs
associated with locating and hiring alternative service providers.
But the naked fact that a manufacturer has a high
percentage of the market for servicing its own products does not
mean that it can raise the price of services or parts with impunity
in that market. See 10 Areeda & Hovenkamp, supra, 1740, at 170-
71. Reputation is important to a firm that constantly competes for
new customers, and a manufacturer's behavior in the aftermarket
probably will be scrutinized by customers shopping for the firm's
products in the primary market. If the firm has a bad reputation,
that will prompt potential customers to go elsewhere. Moreover,
such a firm eventually will suffer defections from its installed
base as well, for firms concerned with the long term cannot afford
to bite the hands that feed them. See id. 1740, at 153; see also
Joseph Kattan, Market Power in the Presence of an Installed Base,
62 Antitrust L. J. 1, 15-16 (1993); Wall, supra, at 33. Under such
circumstances, it ordinarily captures the reality of the
marketplace to envision a firm's behavior in the aftermarket as
having a direct effect on the "cross-elasticity of demand," du
Pont, 351 U.S. at 400, with respect to its products in the primary
market. 
Of course, markets do not always function in the manner
we have just described. Kodak is a case in point. There, a group
of ISOs complained that a copy-machine manufacturer which competed
with ISOs in servicing its brand of copiers had engaged in
exclusionary behavior in its parts and services aftermarket (Kodak
had stopped supplying the ISOs with the parts required to service
Kodak copy machines, while at the same time entering into pacts
with independent parts manufacturers that prohibited them from
supplying the ISOs with copier parts). See Kodak, 504 U.S. at 455-
56. Then, the manufacturer told its customers that they could not
purchase parts unless they agreed to use the manufacturer's
aftermarket services. See id. at 456-58. Coupling evidence of
this scheme with evidence that Kodak was charging supracompetitive
prices in the aftermarket, the ISOs accused Kodak of improperly
expanding its monopoly in the services aftermarket. See id.
Kodak countered that, as a matter of law, a manufacturer
cannot wield monopoly power in a derivative market because
competitive primary markets, by definition, always check
aftermarket behavior. The Court granted certiorari to consider the
bona fides of this argument. See id. at 454-55. Ultimately, it
rejected Kodak's contention as a matter of law and affirmed the
remand for further proceedings because data in the record suggested
that Kodak might in fact have been exacting monopoly prices in its
derivative market and there was no sign that competition in the
primary market deterred it from doing so. See id. at 477-78.
Kodak, then, stands for the proposition that the
foremarket does not always exert sufficient competitive pressure to
insulate the aftermarket from monopolistic practices. It does not
hold, as SMS entreats, that the foremarket never exerts sufficient
competitive pressure to keep the aftermarket pristine. And the
fact that the primary market at times may fail to discipline a
derivative market does not mean that the latter necessarily
constitutes the relevant market for antitrust analysis. Rather, a
litigant who envisions the aftermarket as the relevant market must
advance hard evidence dissociating the competitive situation in the
aftermarket from activities occurring in the primary market. Cf.
id. at 477 (noting that the plaintiff adduced evidence that the
defendants were able to and did charge supracompetitive prices
in the aftermarket). Put another way, a court may conclude that
the aftermarket is the relevant market for antitrust analysis only
if the evidence supports an inference of monopoly power in the
aftermarket that competition in the primary market appears unable
to check. See id. at 481-82; see also 10 Areeda & Hovenkamp,
supra, 1740, at 170-71.
We summarize succinctly. In any market with some degree
of product differentiation, goods of a single brand will enjoy a
certain degree of uniqueness. See 3A Areeda & Hovenkamp, supra, 
761, at 55-56. While that uniqueness may account for a
manufacturer having a large market share in the services
aftermarket for its own brand, that fact, without more, does not
suffice to establish that the manufacturer enjoys monopoly power in
that market. Unless the evidence shows that the manufacturer can
exert raw power in the aftermarket without regard for commercial
consequences in the foremarket, the aftermarket is not the relevant
market. This means that, for antitrust cases involving derivative
markets, courts cannot reflexively resort to traditional product
market definition methods, but must look to other modes of
scrutinizing the existence and measure of market power. As Kodak
teaches, in aftermarket situations, market power vel non must be
assessed by weighing the complete package of primary equipment,
parts, and services.

IV
We turn next to the question of whether SMS has managed
to create a genuine issue of material fact as to DEC's alleged
monopoly power. We think it has not.
A
Laboring to dispel the customary expectation that
competition in the primary market may serve as a substantial
deterrent to anticompetitive behavior in an aftermarket, SMS first
asserts that this is a case in which information costs have
distorted market behavior. The argument has its genesis in Kodak,
where the Court suggested that, under some circumstances, the
foremarket's inability to obtain needed information about the
aftermarket could foil the former's ability to act as a check on
the latter. See Kodak, 504 U.S. at 473-76. Because this
information could be difficult for ordinary copy-machine buyers to
obtain, and Kodak apparently treated informed purchasers more
favorably than uninformed purchasers (through price and term
discrimination), the Court suggested that these facts might explain
Kodak's ability to charge supracompetitive prices in the
aftermarket without suffering adverse consequences in the
foremarket. See id. at 473-74.
DEC counters that the purely prospective nature of its
warranty policy removes this case from Kodak's sphere of influence. 
DEC explains that the only customers affected by the warranty
policy are those who purchase new DEC mid-range systems; contracts
between ISOs and current owners of DEC platforms are unimpaired. 
Furthermore, purchasers are keenly aware of the warranty terms. If
a customer does not like the warranty, DEC continues, he will shop
elsewhere, either for a different brand of computer or for a DEC
computer without a warranty. See, e.g., Digital, 73 F.3d at 762
(explaining that customers will shop for other brands if a
manufacturer does not satisfy their needs).
We agree that both the transparency of DEC's warranty
policy to buyers in the primary market and the policy's prospective
outlook militate in DEC's favor. Let us begin with transparency. 
The Kodak Court's discussion of information costs stemmed
exclusively from the concern that the type of information necessary
for allowing the primary market to check anticompetitive behavior
in the aftermarket was unavailable to the average copy machine
purchaser. See 504 U.S. at 473-76. Given the specific means that
Kodak had adopted to stifle competition, the information relevant
to the primary market would be lifecycle costing, which, the
Justices concluded, was difficult to access. See id. at 473-74.
The information deficits that concerned the Kodak Court
are largely absent here. SMS cites the three-year warranty as the
instrument of market dominance. But, unlike the precise cost of
owning a machine for its useful life (the Kodak scenario), the
warranty's existence is obvious to any purchaser in the primary
market and, therefore, SMS's ruminations about each purchaser's
need to engage in lifecycle costing for installed hardware are
beside the relevant point. Hence, the only datum that bears on
alleged anticompetitive activity in the aftermarket is readily
available to the foremarket. Given that the primary market's
ability to check a firm's behavior in its own aftermarket hinges in
substantial part on whether information about the latter is
sufficiently reflected in the former, the transparency of DEC's
allegedly monopolistic policy represents a salient departure from
the Kodak scenario. Accord PSI Repair Serv., Inc. v. Honeywell,
Inc., 104 F.3d 811, 819-20, 822 (6th Cir.) (concluding that the
fact that the defendant's policies were "generally known" was a
central datum in barring a Kodak-type claim), cert. denied, 520
U.S. 1265 (1997).
The prospective nature of the warranty further
distinguishes this case from Kodak. Kodak had entered into
agreements that precluded the distribution of Kodak parts to ISOs. 
See Kodak, 504 U.S. at 458. These agreements were tantamount to a
retroactive change in the rules because many customers had
purchased Kodak machines against a background understanding that
they would be able to procure parts from ISOs. Accordingly, this
tergiversation detrimentally affected the expectations of those who
had already sunk considerable sums of money into the acquisition of
Kodak equipment. Such "bait and switch" tactics can be problematic
from an antitrust standpoint when they enable exploitation. See
Digital, 73 F.3d at 763 (concluding that "[t]he material dispute
that called for a trial [in Kodak] was whether the change in policy
enabled Kodak to extract supra-competitive prices from customers
who had already purchased its machines"); Lee v. Life Ins. Co. of
N. Am., 23 F.3d 14, 20 (1st Cir. 1994) (noting that Kodak's policy
change jeopardized its customers' ability to protect themselves). 
Like the easy availability of information, the purely prospective
nature of the warranty helps to take this case out of Kodak's
precedential orbit. See PSI Repair, 104 F.3d at 820, 822.
B
Although this constellation of factors undermines SMS's
rote reliance on Kodak, the scenario would be fully dispositive of
SMS's Section 2 claim only if all purchasers in the primary market
were free agents. But SMS says that is not the case. It endeavors
to draw an analogy between the Kodak plaintiffs' need to buy copier
parts and the perceived need of those who already own DEC computers
to purchase any new hardware from DEC (rather than its
competitors). The linchpin of this analogy is SMS's insistence
that repeat purchasers of computers are more or less compelled to
patronize the manufacturer with whom they originally dealt because
of the concomitant investment in, among other things, specialized
training and software. As to these "locked-in" firms, SMS
asseverates, integrating a three-year warranty into new computer
systems is akin to the "policy change" that the Kodak Court decried
because, at the time of the initial purchases, these consumers had
no idea that future generations of DEC computers would bear such
warranty terms.
This argument has some conceptual footing. In theory,
aftermarkets may be insulated from the competitive atmosphere of
primary markets if, and to the extent that, current owners of a
manufacturer's products find it prohibitively dear to "switch" to
another product because of the large investment they have made. 
See Kodak, 504 U.S. at 476. Because of switching costs, these
owners might be harmed even if information about anticompetitive
behavior is reflected in the primary market (for example, the
manufacturer may offer better purchase terms to first-time buyers). 
Withal, we do not believe that the evidence suffices to create a
genuine issue as to whether this theoretical possibility has been
realized here.
Even though SMS's lock-in argument relies heavily on
Kodak, there is an important factual distinction between the two
cases in regard to the nature of the alleged switching costs. When
the Kodak Court spoke of switching costs, it referred specifically
to the cost of purchasing new copying equipment. See Kodak, 504
U.S. at 476-77. What prompted the Court to suggest that switching
would be necessary was Kodak's policy of offering parts only to
those customers who also purchased service from it. This meant
that if a customer did not turn to Kodak for service, it could not
get parts, and its copy machine eventually would be rendered
useless.
Here, by contrast, DEC neither withholds parts nor
otherwise precludes any hardware purchaser from using another
service provider. If a customer prefers to retain an ISO, it does
not need to switch to another computer system. Indeed, the record
shows not only that customers do continue to hire ISOs to service
DEC machines that are under warranty, but that SMS itself bids for
(and has procured) such contracts. Thus, the only switching cost
at issue is the cost of writing off the portion of the equipment's
purchase price that represents the warranty. If the behavior of
consumers and ISOs is any indication, the switching cost is not
particularly significant. (Although SMS presents some conclusory
testimony that this cost is the rough equivalent of the outlays for
regular service contracts, it has absolutely no solid evidence to
back up the claim and, indeed, this testimony is at variance with
its announced position that the warranty is in actuality a "loss
leader" for DEC. See infra note 5.) At any rate, SMS has not
proffered significantly probative evidence sufficient to create a
fact question as to whether this alleged switching cost is material
to a large enough segment of DEC's installed base to harm
competition.
To sum up, while the warranty at issue here may act, at
least in some cases, as a subtle disincentive that inhibits
customers from consulting ISOs (because the customer would, by
retaining an ISO, in effect write off whatever extra cost the
manufacturer had built into the computer's purchase price to permit
it to offer the warranty), there is nothing inherently
anticompetitive about the warranty. Unlike Kodak, this is not a
case in which a manufacturer effectively forces consumers to use
one, and only one, service outfit. Moreover, nothing in the record
before us (except for conclusory, self-serving testimony by SMS
officers, which we need not credit on summary judgment) suggests
that the existence of the warranty dissuades a sufficient number of
customers who otherwise would have used ISOs' from doing so. 
Testimony of unbearable switching costs by a mere handful of
disaffected customers does not satisfy SMS's burden of showing that
consumers are generally worse off as a result of DEC's warranty
policy. See, e.g., 10 Areeda & Hovenkamp, supra, 1740, at 152-
53.
That is essentially what the Eighth Circuit concluded in
a post-Kodak case when it indicated that, as long as a warranty
does not limit a customer's choice of service provider, there is
usually no antitrust problem. See Marts v. Xerox, Inc., 77 F.3d
1109, 1112 (8th Cir. 1996); see also Digital, 73 F.3d at 761-62
(reaching a similar conclusion with respect to installed operating
systems). We agree with this conclusion. Many manufacturers offer
the market bundled products that have separable components. Every
day, consumers purchase these products because "buyers often find
package sales attractive; a seller's decision to offer such
packages can merely be an attempt to compete effectively conduct
that is entirely consistent with the Sherman Act." Jefferson
Parish, 466 U.S. at 12.
Of course, some consumers may not like all the
components, but the overall package fits their needs, they are not
constrained in looking elsewhere for alternative components, and
they will not have to scrap their prior investments just because
the new package is not a perfect fit. Given this commonplace, it
cannot be that every time some consumer or group of consumers does
not like one component of a complex product, the manufacturer will
be exposed to an antitrust claim on the ground that it has
circumscribed consumer choice. The antitrust laws do not require
manufacturers to customize their offerings to the precise
specifications of each and every customer.
At the expense of carting coal to Newcastle, we note a
second serious shortcoming that permeates SMS's lock-in argument. 
Throughout its analysis in this case, SMS assumes that all current
DEC customers fall into the locked-in category. This taxonomy does
not hold together: being part of an installed base and being
locked-in are not synonymous. A lock-in phenomenon must be shown,
not assumed. See Kodak, 504 U.S. at 476; see also 10 Areeda &
Hovenkamp, supra, 1740, at 152-53. Moreover, in undertaking this
inquiry, the nature of the product must be taken fully into
account, for that will inform an inquiring court about the degree
of effective control the manufacturer may be able to exert over a
consumer's purchasing decisions. That is singularly important
here, for the evidence required to show that an installed base is
locked-in to future purchases of computer systems is quite
different from that needed to show that a copy machine owner is
locked-in to buying parts for that machine.
It is an article of faith, for antitrust purposes, that
unless a substantial number of preexisting customers are locked-in,
defections from the manufacturer's installed base, coupled with
losses in the foremarket, in all probability will sabotage any
effort to exploit the aftermarket. Our review of the instant
record affords no reason to believe that an appreciable number of
DEC users are, in fact, significantly locked-in to making repeat
purchases of DEC mid-range computers. SMS's most direct evidence
of lock-in comes from the testimony of individuals employed by two
of DEC's customers. These individuals none of whom bore the
ultimate responsibility for making decisions regarding new computer
purchases and none of whom exhibited any specific or detailed
knowledge of how management might go about calculating switching
costs testified generally that once a company has committed to a
certain brand of hardware and has acquired ancillary software
(including an operating system), it would be costly to migrate to
another platform. Significantly, however, the testimony fails
properly to account for the nature of a company's decision to
purchase new computer hardware and, therefore, we cannot put much
stock in it.
The evidence to which we have just referred assumes that
a company's decision to replace its computer system will be
dictated solely by the hardware that it currently uses. Under
certain circumstances, the assumption might hold. The best example 
probably derives from the analogy that Kodak offers. Although the
owner of a copy machine might hope that he will not require parts
during the machine's useful life, the hope defies reality. When
the moment of need occurs, the corporate decisionmaker must be able
to purchase a Kodak part or else, scrap the machine. The
fragility of the equipment forces the owner to buy parts, and this
need, linked with owners' general unwillingness to sacrifice the
remaining useful life of machinery, enables the manufacturer to
control and exploit the situation.
The record evidence shows that decisionmaking surrounding
the purchase of a new mid-range computer, however, is qualitatively
different from the decision to buy copier parts. Typically, a much
wider variety of factors will enter into the computer user's
decision. Although we do not discount the impact of a server's
speed and power (which will lead to hardware upgrades), the record
indicates that the availability of software applications designed
to meet current or anticipated business needs usually is the
determinative factor in this calculus.
This reality is largely borne out by a marketing survey
and report that SMS considers to be one of the most significant
pieces of documentary evidence in this case. The report's
observations are particularly noteworthy because many of the survey
respondents were chosen from DEC's installed base and the purpose
of the study was to gauge their receptivity to DEC's Alpha and VAX
computers. The survey concludes that end users do not focus
principally on hardware when making decisions about buying new
systems. Rather, in the words of the report, "applications drive
the choice of platforms," because software applications represent
the business solutions to the problems confronting the computer
user. There is no record evidence that contradicts, or even comes
close to undercutting, this telling point.
A fortiori, if software is the primary determinant in
commercial decisionmaking on computer system purchases, the power
of affecting a customer's purchasing decisions resides more with
those who design and sell software than with hardware
manufacturers. That is exactly what the survey indicates. To
complicate matters further, software companies tend to develop
their applications so that they can be used with the more popular
operating systems. In turn, given the efficiencies of networks,
many consumers tend to opt for software that is usable on such
systems. The evidence in this case shows that operating systems
other than DEC's VMS such as Windows NT and UNIX are becoming
increasingly prevalent (which perhaps explains why DEC engineered
the new Alpha line to operate with all three) and many other
hardware manufacturers make systems that can accommodate these
other operating systems. If DEC is to remain the company of choice
for its installed base, it cannot rest on its laurels.
The complex nature of the decision to purchase a new
computer system means that an analysis of switching costs in this
context cannot parrot the linear inquiry that proved possible in
Kodak. Here, the cost of shifting to another system must take into
account the efficiency gains of buying new software gains that
often may dwarf hardware price in dollar terms. This is true even
if one considers the switching costs that are associated with
retraining employees and discarding software designed to run
exclusively on a particular platform. The record demonstrates
convincingly that, in this industry, both software vendors and
hardware manufacturers offer migration support for new customers in
the form of significant discounts on training, installation, and
software conversion, thus internalizing much of the switching
costs.
The impressions that we have gathered from the marketing
survey are largely confirmed by the very witnesses on whose
testimony SMS relies. Quite aside from the statements these
witnesses make about the magnitude of the cost of randomly
switching from one currently functioning computer system to another
testimony which, as is clear from our discussion, addresses an
irrelevant scenario all of them acknowledge that, all things
considered, if a new computer system would bring more benefits,
there would be no objection to the switch. The actual behavior of
these witnesses' employers illustrates the point: their firms were
in fact in the process of switching some of their systems to other
platforms, citing the sorts of reasons we have catalogued.
In fine, the record does not support the conclusion that
a substantial number of installed base customers are locked-in 
and SMS has failed to make the case. The power of software
vendors, the rapid progress of software solutions, the
unpredictability of when consumers will seek to purchase a brand
new system, the ready willingness of competitors to absorb
migration costs, and the uncertain calculus of cost versus
efficiency gains that obtains when a firm moves to new applications
all distinguish the computer purchase context from the copier
context. This plethora of factors strongly implies that, in most
instances, DEC has no effective control over whether a customer
will remain loyal when opting to purchase a new computer system.
To address these issues, which are central to assessing
the existence of a lock-in, SMS ought to have focused on proof of
the actual behavior of an installed base in terms of such
consumers' tendency to return to the same manufacturer. It did not
marshal any such proofs. Consequently, the record lacks the
empirical evidence required to give us a proper glimpse into
whether members of an installed base actually behave in conformity
with SMS's switching cost hypothesis. Although we do not doubt
that some customers may experience the lock-in that SMS envisions,
the record affords no reason to believe that such customers are
numerous or that they are representative of the installed base. 
And in marked contrast to Kodak there is no evidence, direct or
circumstantial, that DEC has attempted to locate or exploit
vulnerable customers within its installed base (or that it has the
capacity to identify and isolate such customers).
These last points are particularly important. In a
product-differentiated market (such as the mid-range computer
hardware market), there always will be a subset of customers whose
subjective preferences, given their specific business needs, will
align them more closely with one manufacturer. As we remarked in
a closely related context, however, this kind of preference does
not translate into the kind of economic power that antitrust law
aims to mitigate. See Grappone, 858 F.2d at 797 ("Of course,
virtually every seller of a branded product has some customers who
especially prefer its product. But to permit that fact alone to
show market power is to condemn ties that are bound to be harmless,
including some that may serve some useful social purpose."). 
Sophisticated consumers with such preferences will know beforehand
that they will lock themselves in by their choice of manufacturer
and do so willingly. What would be of concern is if a firm were
able to extend its control by improper means over a sufficiently
sizable number of customers who did not have such a preference. 
The facts at hand do not fit this model. The evidence, taken most
favorably to SMS, does not demonstrate a lock-in, certainly not one
that raises antitrust concerns. See 10 Areeda & Hovenkamp, supra,
1740, at 152-53.
C
Because this case arises on an appeal from the entry of
summary judgment, it behooves us to stress further SMS's failures
at the empirical level.
Here, unlike in Kodak, the record is devoid of any
evidence of supracompetitive prices or other oppressive terms of
business in the aftermarket. Here, unlike in Kodak, the record
furnishes no reason to believe that new customers are irrelevant to
DEC; to the contrary the record shows unequivocally that DEC
intended to sell Alpha computers vigorously to new as well as old
customers in an effort to grow its market share. Here, unlike in
Kodak, there is also no proof indicating that DEC has attempted to
discriminate between customers who are knowledgeable and those who
are not, or that it discriminates in price (or in offering
different warranty terms) between new and repeat purchasers. Such
discrimination, the Court explained, would be one way that
manufacturers would attempt to prevent sophisticated purchasers
from disciplining the aftermarket through their decision to forego
buying from the manufacturer. See Kodak, 504 U.S. at 475. 
Moreover, data such as these that new customers remain important
to DEC and that the warranties offered to new and installed base
customers have exactly the same terms are further signs of the
absence of aftermarket exploitation. See 10 Areeda & Hovenkamp,
supra, 1740, at 159.
All of these factors were crucial to the Kodak Court's
conclusions, forming the bases for the Court's attempts to explain,
through hypotheses involving information deficits and switching
costs, the possible causes of the market's apparently irregular
behavior. See id. at 473-78. DEC's alleged behavior, however, is
worlds apart from Kodak's. In the absence of comparably suspicious
practices, there is no reason to assume that DEC's interest in
maintaining its position in a fiercely competitive primary market
is not checking any exploitative tendencies in the derivative
market.
Represented by able counsel, SMS strives resourcefully to
fill these evidentiary gaps. When queried at oral argument, it
referred us to the affidavit of Joseph Scordino (SMS's director of
marketing). That affidavit does not remedy the empirical
shortcomings that we have identified. The closest it comes is the
following: "It has been my experience that when [DEC] does not
face competition, its prices tend to be higher. For example, [DEC]
does not discount its maintenance services on the Alpha 8000s. 
Thus, the elimination of competition from SMS and other Independent
Service Organizations, should result in price increases to
customers." We fail to see how we can allow this self-serving
speculation to pass for competent evidence. The third sentence is
conclusory conjecture of a kind that begs the very question at
issue, namely, whether the foremarket sufficiently disciplines the
aftermarket. The same is true for the first sentence, because, if
competition in the foremarket checks activity in the aftermarket,
the absence of competitors in the aftermarket will not lead to
higher prices. The second sentence, which deals with Alpha 8000s,
is irrelevant; those computers are high-end servers and belong to
a different product market (and the record is bereft of evidence
that the market structure for high-end servers has any bearing,
direct or by reasoned analogy, on the market structure for mid-
range servers).
SMS also cites the report of its retained expert, Dr.
William Bleuel, to the effect that DEC has a much greater share of
the services aftermarket than it should enjoy, given low customer
satisfaction. If DEC did not have monopoly power, this argument
runs, it would not have been able to keep its large share of the
aftermarket in spite of rampant dissatisfaction. Expert opinions,
however, are no better than the data and methodology that undergird
them and, on this score, Dr. Bleuel's conclusions are highly
suspect. Although we find Dr. Bleuel's report deficient on several
levels, it suffices to discuss only the shortcomings of his data
collection.
Dr. Bleuel did not conduct a customer satisfaction
survey, but based his opinion on his interpretation of certain
internal DEC documents. The relevant part of his report begins
with the intuitively obvious proposition that when customer
satisfaction declines, chances are that a company will lose some
business. Then, citing to sources which it neither attaches nor
discusses, the report concludes that DEC's customer satisfaction
ratings have been declining. Dr. Bleuel's conclusion may or may
not be correct, but an expert must vouchsafe the reliability of the
data on which he relies and explain how the cumulation of that data
was consistent with standards of the expert's profession. See
Wessmann v. Gittens, 160 F.3d 790, 804-05 (1st Cir. 1998); see also
Kumlo Tire Co. v. Carmichael, 119 S. Ct. 1167, 1176 (1999)
(directing courts "to make certain that an expert, whether basing
testimony upon professional studies or personal experience, employs
in the courtroom the same level of intellectual rigor that
characterizes the practice of an expert in the relevant field").
Not only did Dr. Bleuel fail to discuss in his report the
nature of the data and its meaning, but he failed to explain
whether the information-gathering technique used in the DEC
documents was valid, whether the data was sufficiently
representative to permit him to draw any relevant conclusions, and
whether the sampling methodology used to compile these documents
corresponded to methods that might be considered legitimate in his
discipline. Expert testimony that offers only a bare conclusion is
insufficient to prove the expert's point. See Mid-State Fertilizer
Co. v. Exchange Nat'l Bank, 877 F.2d 1333, 1339 (7th Cir. 1989)
("An expert who supplies nothing but a bottom line supplies nothing
of value to the judicial process.").
V
We add a coda. When a party brings a Section 2 claim, it
is not enough simply to show that there is monopoly power. 
Monopoly power may be obtained through legitimate means. An
antitrust problem arises only when an improper use of that power,
to the detriment of the forces of competition, occurs. Thus, to
make out a Section 2 claim, the plaintiff must show that the
alleged monopolist has engaged in improper exclusionary conduct. 
See Kodak, 504 U.S. at 482-83; Aspen Skiing Co. v. Aspen Highlands
Skiing Corp., 472 U.S. 585, 600-05 (1985); Barry Wright Corp. v.
ITT Grinnell Corp., 724 F.2d 227, 230 (1st Cir. 1983).
The improper conduct identified by SMS is the inclusion
of a three-year warranty on new equipment in the purchase package. 
But a warranty has obvious virtue as a tool of competition, and the
commercial justification for its use is compelling. Indeed, people
ordinarily associate warranties with consumer welfare and highly
competitive markets.
To avoid the presumption that DEC's warranty is no more
than a legitimate sales tool, SMS points to two internal documents
which it claims show that DEC intended to use the warranty as a
device to capture the totality of the services aftermarket. These
documents appear to be a part of an ongoing series of
correspondence between DEC functionaries relative to the launching
of the Alpha product line. One document makes mention of the
warranties having "100% penetration with all product sales" and the
other makes a similar point. Read in context, neither document so
much as hints at an intent to suffocate the aftermarket. The mere
fact that the terms "warranty," "penetration," and "100%" appear in
a single writing does not signal an improper attempt to distort
market forces.
In the last analysis, SMS's monopoly power hypothesis
defies common sense. If the three-year warranty is the only means
toward monopolization, it will, under the assumptions that SMS
adopts, prove to be a remarkably ineffective tool. SMS has taken
the position that the warranty actually represents a loss to DEC
because, all things being equal, DEC can make more money providing
services than it can offering warranties. See supra note 5. If
this is true, SMS's argument takes on the flavor of the predatory
pricing cases and, therefore, must afford some basis for a belief
that DEC can recoup these losses at some point in the future in
order to make the enterprise worthwhile.
But DEC has placed no restriction on the aftermarket for
service of its products. Parts are available to all market
participants, and there is no indication in the record either that
there are restrictions on their availability or that such a policy
is even being contemplated. Meanwhile, ISOs are free to service
all DEC computers, including those that are under warranty, both
during the warranty period and after its expiration. On these
facts, it seems highly unlikely that DEC will recoup the sums that
SMS says that it foregoes when it offers the warranties in the
first place. All of this indicates that the more likely
explanation for the warranty relates to its efficiency as a means
of growing market share in the primary market. In any event,
sacrifice now/recoup later claims do not necessarily bespeak
monopolistic behavior, see, e.g., Barry Wright, 724 F.2d at 231-36,
and we believe that this dimension of SMS's logic is yet another
element that distances its case from Kodak while simultaneously
bringing it within the orbit of Matsuthita Elec. Indus. Co. v.
Zenith Radio Corp., 475 U.S. 574, 587 (1986) (noting that evidence
must be even more persuasive to stave off summary judgment when the
theory set forth by the party opposing the motion is implausible).
That SMS may have lost business as a result of DEC's
policy is not, in and of itself, a concern of the antitrust laws. 
Antitrust law is designed to protect competition, not competitors. 
See Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458-59
(1993). If there is no objective indication of harm to
competition, we cannot stifle a firm's ability to compete in the
primary market just because some of its aftermarket competitors
complain that they have lost business as a result. After all, such
harm frequently occurs due to the specialized and dependent nature
of the investment made by aftermarket firms rather than as the
anticompetitive exercise of market power by manufacturers. See 3A
Areeda & Hovenkamp, supra, 762, at 65-66 (explaining the
phenomenon in the context of self-distribution decisions made by
manufacturers).
VI
We need go no further. The Kodak Court resorted to
economic theory in order to highlight the possibility that, under
the notably sinister circumstances of the case (evidence of
supracompetitive prices in the aftermarket, price discrimination
favoring certain consumers, and no resulting change in sales in the
primary market), information deficits and switching costs better
explained the available market data than did the defendant's glib
assertion that the aftermarket is never independent of the
foremarket. Theory is powerful when it explains reality. But when
evidence for the trumpeted reality is lacking, the theory is of no
practical value. Here, the record contains no significantly
probative evidence that DEC is engaged in sinister practices or
otherwise suffocating competition, and, hence, theoretical
possibilities alone are inadequate to block the swing of the
summary judgment ax.

Affirmed.